# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 97-1168

_____

Julie H. Lee,                                          *
                                                       *
                    Plaintiff - Appellant,             *
                                                       *
          v.                                           *   Appeal from the United States
                                                       *   District Court for the District
State of Minnesota, Department                         *   of Minnesota.
of Commerce; James E. Ulland,                          *
Commissioner; Tammy McGlone,                           *
individually and in her official capacity,             *
                                                       *
                    Defendants - Appellees.            *

_____

Submitted: October 22, 1997
Filed: August 18, 1998

_____

Before BEAM and FLOYD R. GIBSON, Circuit Judges, and WEBB,[1] District Judge.

_____

FLOYD R. GIBSON, Circuit Judge.

Julie H. Lee appeals from the district court's[2] order granting the State of Minnesota, Department of Commerce (the "State") summary judgment in this gender

_____

[1]The HONORABLE RODNEY S. WEBB, United States District Judge for the District of North Dakota, sitting by designation.

[2]The HONORABLE RICHARD H. KYLE, United States District Judge for the District of Minnesota.

discrimination case.  Because we conclude that Lee has failed to present evidence that raises a reasonable inference that her gender was a determinative factor in the adverse employment decision, we affirm.  In addition, Lee appeals the district court's order dismissing her retaliation claim against Tammy McGlone, the Director of Personnel for the Department of Commerce.  Because we conclude that Lee failed to raise this argument to the district court, we affirm the district court's dismissal of this claim.

## I.    BACKGROUND

Lee works for the Department of Commerce (the "Department") as a Commerce Analyst 2.  In October of 1993, Lee applied to the Department of Employee Relations ("DOER") for a reallocation[3] of her position from an Analyst 2 to an Analyst 3. Initially, John Gross, Lee's supervisor, supported her request for a reallocation because he believed that Lee was performing the work of an Analyst 3.  On November 19, 1993, Gross relayed to Lee that Patrick Nelson, the Deputy Commissioner of Commerce, had informed him that the Department wanted only one Analyst 3 in Lee's section.

On December 9, 1993, McGlone sent a memorandum to DOER which indicated that the Department did not support Lee's reallocation request.  In particular, McGlone reported that "[c]urrently, the life and health section of policy analysis does have a lead worker assigned in the Analyst 3 position.  It has never been the divisions [sic] practice to have more than one lead worker. . . .  The structure of the division does not support two lead workers."  J.A. at 60.  On December 27, 1993, James E. Ulland, the Commissioner of Commerce, sent a memorandum to Lee similarly communicating to her that "the [A]nalyst 3 positions are quite limited.  In fact, there is only one

---

[3]Reallocation is defined as a "reclassification resulting from significant changes over a period of time in the duties and responsibilities of a position."  Minn. Stat. Ann. § 43A.02, subd. 35 (West 1988).

designated for your group. . . . It would be very difficult to justify going to two lead workers." Id. at 120.

Lee believes that McGlone's response to DOER provided false and misleading information about the current and prior male Analyst 3s' duties and about Lee's duties. Specifically, Lee claims that "leadwork" had not been an issue for the Analyst 3 position until it was applied to her as the first female candidate. Neither the current nor the former male Analyst 3s performed the "leadwork" component of the position as that component was now being applied to Lee as a standard requirement for an Analyst 3. Lee further believes that this leadwork information came from Betsy Kostuch, McGlone's subordinate, and that McGlone instructed Kostuch to find some basis for denying Lee's reallocation request. For instance, Kostuch stated that McGlone instructed her "to go up to DOER and get the whole file [regarding Lee's reallocation] . . . and to go through it and make sure that there wasn't anything in there that . . . would incriminate" McGlone in trying to prevent Lee's reallocation. Id. at 92.

On January 3, 1994, Gross informed McGlone that he believed that she had not accurately described Lee's duties and accomplishments. Again, Gross endorsed Lee's reallocation to an Analyst 3, while acknowledging that "management doesn't want to expand the number of Senior Analysts in the Life and Health Section." Id. at 62.

On January 10, 1994, DOER reported to Lee that the reallocation process had been suspended after receiving information from McGlone that the Department had resolved the issue. Consequently, the Minnesota Association of Professional Employees ("MAPE" or the "union") filed a grievance on Lee's behalf alleging gender discrimination regarding the leadwork criteria as well as interference with the reallocation process. John Ingrassia, the supervisor of Lee's section, agreed that there were "overtones of sex discrimination" against Lee in not being reallocated to an Analyst 3. Id. at 75. Ingrassia also noted that "there was an obvious good-ol'-boy network type of thing" against Lee by the three other male analysts. Id.

-3-

On January 12, 1994, after receiving DOER's definition of leadwork,[4] Gross informed Lee that she was not performing leadwork and withdrew his support for her reallocation. Gross further acknowledged that, since the current male Analyst 3 did not perform his job according to this definition of leadwork, his duties would have to be changed to fit this concept of leadwork.

In the meantime, DOER resumed work on Lee's reallocation request, assigning Suzanne Brothen, who worked in DOER's staffing division, to review or "audit" this request. To determine whether Lee should receive her reallocation, Brothen spoke with Lee about her job duties and also consulted the applicable job descriptions for Analyst 2 and 3. Brothen further reviewed information that she received from the Department, including Gross's initial letter of support and a letter from Deputy Commerce Commissioner Nelson which indicated that the Department wanted to have only one Analyst 3 position in Lee's area. After analyzing this information, Brothen denied Lee's reallocation request because Lee "didn't meet the definition of the [Analyst 3] and that

_____

[4]DOER defines "leadwork" as:

> Under limited supervision, leadwork is the ongoing, daily responsibility to prioritize, schedule, assign, direct, guide and report on the work activities of other state employees so that the work is completed in an efficient and effective manner. This is accomplished by recommending to the supervisor or manager the allocation of human and financial resources; by distributing and reassigning work tasks to other state employees; by directing other state employees on daily work assingments; by instructing other state employees on how to complete their work tasks; by taking immediate remedial action to correct and improve their work; and by reporting on the quality, quantity and timeliness of work performance to the supervisor or manager.

Id. at 27.

it was the intent of the agency to maintain only one [Analyst 3] position in that work unit."  Id. at 31.

On February 3, 1994, Brothen sent Lee a letter to inform Lee that DOER had denied her reallocation request.  This letter explained that

> [i]n the Commerce Analyst series, movement to the [Analyst 3] is dependent on the assignment of the "lead" role to a given position. Historically, the lead role has gone hand in hand with an identification of the expanded knowledge base, but the expanded knowledge base does not in itself confer a "lead" role.  In addition to the acquisition and application of greater program knowledge, the agency historically has identified a position as the "lead[.]"  It is the right of management to determine the structure of the agency.  It is my understanding that Commerce management has determined to have only one "lead" position identified in this work unit.  That position is currently filled.

Id. at 115.

Subsequently, Lee filed suit, alleging that the State denied her reallocation request because of her gender in violation of Title VII, see 42 U.S.C. §§ 2000e to 2000e-17 (1994) , and the Minnesota Human Rights Act ("MHRA"), see Minn. Stat. Ann. § 363.03, subd. 1(2)(c) (West Supp. 1998).  In addition, Lee claimed that "Defendant McGlone" retaliated against Lee because of Lee's opposition to the gender discrimination in the reallocation process in violation of Title VII, see 42 U.S.C. § 2000e-3(a) (1994), and the MHRA, see Minn. Stat. Ann. § 363.03, subd. 7(1) (West Supp. 1998).  Lee also brought several state-law tort claims against the State and McGlone.[5]

---

[5]The state-law tort claims brought against McGlone included: defamation; tortious interference with contractual relations; tortious interference with prospective advantage; intentional infliction of emotional distress; and negligent infliction of

The district court granted the State summary judgment on the gender discrimination claim, finding that, although Lee established a <u>prima facie</u> case of gender discrimination, Lee "failed to present evidence that supports a reasonable inference that [the State's] reasons were a pretext for discrimination." Appellant's Add. at 11. The district court then dismissed the Title VII gender discrimination and retaliation claims against McGlone because Title VII does not impose individual liability on supervisors. Finally, the district court, after declining to exercise supplemental jurisdiction, dismissed Lee's remaining MHRA and state-law tort claims. Lee appeals.

## II. DISCUSSION

We review <u>de novo</u> a grant of summary judgment. The standard we apply is the same as the district court applied: whether the record shows that no genuine issue as to any material fact exists and that the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c); <u>Johnson v. Baptist Med. Ctr.</u>, 97 F.3d 1070, 1072 (8th Cir. 1996).

### A. The Gender Discrimination Claim

Title VII gender discrimination actions follow the well-established burden shifting analysis set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973). <u>See also</u> <u>Johnson</u>, 97 F.3d at 1072. We apply this same analysis in reviewing employment discrimination claims brought under the MHRA. <u>See</u> <u>Feges v. Perkins Restaurants, Inc.</u>, 483 N.W.2d 701, 710 (Minn. 1992).

---

emotional distress. Lee also made a claim for negligent supervision against the State. Initially, Lee also brought claims for fraudulent and negligent misrepresentation against McGlone but voluntarily agreed that the district court dismiss these claims with prejudice.

For the purpose of analysis, we will assume that Lee has established her prima facie case of gender discrimination. The State articulates two legitimate, non-discriminatory reasons for denying Lee's reallocation request: (1) Lee was not assigned to do leadwork, which the State claims is a requirement for an Analyst 3; and (2) the Department wanted to have only one Analyst 3 in Lee's unit. Because the State has advanced legitimate, non-discriminatory reasons for its adverse employment action, Lee "must produce some evidence creating a genuine issue of fact as to whether [the State's] explanation is pretextual and whether [the State] harbored a discriminatory intent." Johnson, 97 F.3d at 1073; see also Ryther v. KARE 11, 108 F.3d 832, 837-38 (Lay, majority) and 848 (Loken, dissenting) (8th Cir.) (en banc), cert. denied, 117 S. Ct. 2510 (1997).

Lee identifies the following evidence to support her claim that the State's proffered reasons constitute a pretext for intentional gender discrimination. First, regarding the alleged leadwork requirement for the Analyst 3 position, Lee maintains that she performed the necessary components of leadwork as those components had been applied to the similarly situated male Analyst 3s and that Gross's support of her reallocation establishes that she was performining the necessary duties in order to qualify for an Analyst 3 position. Lee further notes that leadwork had not been an issue until the Department applied this criteria to Lee, the first female seeking reallocation to an Analyst 3 position. Moreover, Lee points out that, if leadwork was an essential function of the Analyst 3 position, then the current male Analyst 3 would have been performing leadwork, which Gross acknowledged was not the case. However, McGlone made false statements alleging that, unlike the male Analyst 3s, Lee did not perform leadwork, and DOER denied Lee's reallocation request based on the information received from McGlone. Therefore, Lee concludes that a disputed issue of material fact exists regarding whether the Department required leadwork as a necessary component of an Analyst 3 position. As such, Lee asserts that this evidence is sufficient to raise the inference that the State's proffered reason regarding leadwork is pretextual and not worthy of belief.

Second, Lee argues that the State's additional stated reason regarding the Department's management decision to have only one leadworker in Lee's section is pretextual and unworthy of belief. Lee contends that the State has been inconsistent in its explanation for the denial of the reallocation. In particular, Lee maintains that the State initially alleged (1) that the sole reason that Lee was not reallocated was based on her failure to perform leadwork; and (2) that DOER made the reallocation decision independent of Commerce. Lee then submits that the State later reversed its position, claiming that the Department only wanted one leadworker and that the Department had the management right to decide the structure of its agency. Lee concludes that, regardless of the propriety of the State's business decision, such materially conflicting evidence raises a question of fact as to the credibility of the State's proffered reason. We disagree.

Evidence that the State's proffered reason for denying Lee's reallocation request was pretextual will only defeat summary judgment if the evidence could persuade a reasonable fact-finder that Lee was discharged because of intentional gender discrimination. See Ryther, 108 F.3d at 842. Here, we conclude that the mere differential treatment between the male Analyst 3s and Lee does not support any reasonable inference of gender discrimination. It is suspect whether Lee was similarly situated to the former and current male Analyst 3s because the male Analyst 3s attained this position through an open application process as opposed to a reallocation; therefore, the males did not have to establish that they were performing leadwork in order to qualify for the position.

Moreover, the Department possessed the prerogative to change what job duties the Department expected an Analyst 3 to perform. This circuit has acknowledged that "employers have wide latitude to make business decisions," including the right to change an employee's duties. McLaughlin v. Esselte Pendaflex Corp., 50 F.3d 507, 511-12 (8th Cir. 1995). The mere fact that the Department clarified its expectations regarding the leadwork component at the time Lee sought reclassification does not

render this reason unworthy of credence and establish invidious, gender discrimination, especially when the current male Analyst 3's job was to conform to the new standard. In fact, we note that Lee's supervisor Gross withdrew his support for her reallocation upon learning about the Department's definition of "leadwork" and concluding that Lee did not meet this definition.

Finally, although the record may reveal that McGlone disliked Lee, none of this evidence raises a reasonable inference of gender discrimination as Title VII does not "prohibit employment decisions based upon . . . erroneous evaluations [or] personal conflicts between employees." Hill v. St. Louis Univ., 123 F.3d 1114, 1120 (8th Cir. 1997). In any event, the record shows that Deputy Commerce Commissioner Nelson made the decision regarding the Department's staffing needs and that DOER denied Lee's reallocation request relying upon "the right of management to determine the structure of the agency." J.A. at 115. Thus, any evidence regarding McGlone's dislike for Lee or allegedly false and discriminatory actions do not apply to the adverse employement action. See McLaughlin, 50 F.3d at 512 (statements made by employees not involved in the decision do not give rise to a reasonable inference of discrimination). Similarly, Ingrassia's statements regarding the alleged "good-ol'-boy network" and the "overtones of sex discrimination" against Lee, J.A. at 75, do not support a reasonable inference of gender discrimination because Ingrassia was not involved in the decision to deny Lee's reallocation request and these comments relate to the hostility Ingrassia perceived between Lee and non-decisionmakers, McGlone as well as the other three males working in the division. See McLaughlin, 50 F.3d at 512.

We also conclude that Lee fails to prove that the Department's second proffered reason --the Department's management decision to have only one leadworker in Lee's section-- constitutes a pretext for gender discrimination. Although Lee claims that the Department submitted inconsistent explanations for opposing her reallocation request, we must disagree. Instead, as early as November 11, 1993, Deputy Commerce Commissioner Nelson stated that the Department wanted only one Analyst 3 in Lee's

division. McGlone repeated this same reason in her December 9, 1993 memorandum to DOER. Similarly, the Commissioner of Commerce, James Ulland, informed Lee on December 27, 1993, that there was only one Analyst 3 position designated for her group. Therefore, we hold that the proof of discriminatory intent is insufficient to support a jury verdict in Lee's favor and find that the district court properly granted summary judgment to the State.

## B.    The Retaliation Claim

We next turn to Lee's argument that the district court erred in ruling that Lee's retaliation claim[6] was brought against McGlone in her individual capacity and, thus, was insufficient to state a claim against the State because Title VII does not impose individual liability on supervisors or co-workers. Lee maintains that her retaliation claim against McGlone, the employer's agent, is sufficient to state a claim against the State under a respondeat superior liability theory. Although Lee's contention may have some merit, Lee failed to raise this argument to the district court.[7] Therefore, we need

---

[6]In Count I, paragraph 26 of Lee's Complaint, Lee alleged that "Defendant McGlone retaliated against Ms. Lee because she reasonably, in good faith, opposed gender discrimination in the reallocation process." J.A. at 14. The complaint further alleged that "[a]t all times material, Defendant McGlone was the Director of Personnel for the Department of Commerce and acted within the scope of her employment with said Department." Id. at 10.

[7]In the State's Memorandum of Law in Support of its Motion for Summary Judgment, the State first argued that neither Title VII nor the MHRA permits an action against McGlone in her individual capacity because McGlone does not qualify as an "employer" under the relevant statutes. However in her Memorandum of Law in Opposition to the State's Motion for Summary Judgment, Lee counters that McGlone should be individually liable under Title VII and the MHRA, but nowhere argues that the State is, nonetheless, vicariously liable for McGlone's alleged discriminatory acts committed within the scope of her employment. Instead, counsel for Lee apparently operated under the mistaken belief that the State had not "moved for dismissal of [Lee]'s retaliation claims under Title VII and the MHRA." Plaintiff's Mem. of Law in

not consider Lee's argument raised for the first time on appeal. <u>See</u> <u>Curtis v. Elec. & Space Corp.</u>, 113 F.3d 1498, 1503 n.2 (8th Cir. 1997). In any event, after construing the facts[8] in the light most favorable to Lee, we conclude that Lee does not present evidence sufficient to demonstrate any adverse employment action that is actionable under Title VII. <u>See</u> <u>Manning v. Metropolitan Life Ins. Co., Inc.</u>, 127 F.3d 686, 692-93 (8th Cir. 1997); <u>Ledergerber v. Stangler</u>, 122 F.3d 1142, 1144-45 (8th Cir. 1997). Accordingly, we affirm the district court's dismissal of Lee's retaliation claim.

## III.   CONCLUSION

After carefully reviewing the record and applicable law, we find that Lee's remaining arguments have no merit. For the reasons set forth in this opinion, we affirm the district court's judgment.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

Opp'n to Def.'s Motion for Summ. J. at 19. Again, in the State's Reply Memorandum, the State reiterated that the district court should dismiss Lee's retaliation claims under Title VII, in part, because Lee's complaint solely states a retaliation claim against McGlone in her individual capacity and McGlone, who does not qualify as an "employer," is not a proper defendant for this claim.

[8]Lee alleges that, following her grievance for gender discrimination, McGlone "made false and damaging statements to other employees about Ms. Lee, which included: that she could not perform the functions of her job; that she only retained her job because she had connections; that she does not work while on the job; that she does not understand her job; and that she is crazy." J.A. at 13.